*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHAUNTAYE A. PHILLIPS, Personal
Representative of the ESTATE OF HAROLD
PHILLIPS,

      Plaintiff-Appellee,

v

CITY OF DETROIT, DETROIT ANIMAL CARE
AND CONTROL, MARK KUMPF, LORI SOWLE,
CARL MCCLANAHAN, and ELIZABETH
SUMMERFIELD,

      Defendants-Appellants,

and

FRIENDS OF DETROIT ANIMAL CARE AND
CONTROL, JOHN/JANE DOE INVESTIGATORS
OF DACC, JOHN/JANE DOE OFFICERS OF
DACC, ROY GOODMAN, and TREVINA
GOODMAN,

      Defendants.

UNPUBLISHED
December 17, 2025
11:04 AM

No. 371590
Wayne Circuit Court
LC No. 24-004825-NO

Before: RIORDAN, P.J., and GARRETT and MARIANI, JJ.

PER CURIAM.

Defendants, the City of Detroit (the City), Detroit Animal Care and Control (DACC), and individual employees of DACC—Mark Kumpf, Lori Sowle, Carl McClanahan, and Elizabeth Summerfield—appeal by right the trial court's order denying their motion for summary disposition under MCR 2.116(C)(7) (immunity granted by law) on the basis that the motion was premature. We affirm.

-1-

# I. FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 6:00 p.m. on January 29, 2024, Harold Phillips was attacked by three dogs in the City while he was walking home from work. The dogs belonged to City residents Trevina and Roy Goodman but were roaming the street unleashed and unsupervised at the time of the attack. Phillips was rushed to a nearby hospital for treatment, but he ultimately died from his injuries on February 2, 2024.

On April 1, 2024, plaintiff, as personal representative of Harold Phillips's estate, filed a complaint seeking damages for Phillips's fatal injuries sustained during the dog attack. Plaintiff named the Goodmans as defendants, alleging that, as the dogs' owners, they were liable for Phillips's injuries under theories of strict liability, MCL 287.351 (dog-bite statute) and MCL 287.323 (defining criminal penalties in relation to dangerous animals), and negligence.[1] Relevant to this appeal, plaintiff also named as defendants and sought damages from the City, DACC, and several individuals employed at DACC, including DACC's director (Kumpf), DACC's interim director (Lowle), a DACC field operations manager (McClanahan), and a DACC investigator (Summerfield).

Regarding the City and DACC, plaintiff alleged in the complaint that they were engaged in a proprietary function at the time of the dog attack. Specifically, plaintiff alleged that DACC was "responsible for protecting the health, safety and welfare of the residents and visitors of the City of Detroit from animal bites, dangerous animals, vicious animals, and the owners of dangerous and/or vicious animals and enforcing" laws and ordinances to that effect. In recent years, however, DACC had been receiving a significant amount of its funding from Friends of DACC (FODACC), a non-profit organization that first began operating in 2017 and that sourced much of that funding from various "national societies, foundations, and organizations" that regularly lobbied and pushed for "no-kill" shelters nationwide. Plaintiff alleged that FODACC's national affiliates "create a financial inducement for beleaguered municipal animal control departments," such as DACC, "to align with their goals and ideals." Thus, plaintiff alleged, to secure access to these affiliates' "ample resources," DACC allowed FODACC and its affiliates "to exert extensive influence into how and when [the animal-control section] of the City Code is, or is not, enforced," and had thereby "ceded its control in exchange for the pecuniary profit that affiliation with FODACC" and its "outside partnerships, consultancies, and donors provides to" DACC.

Plaintiff alleged that, from 2019-2023, revenues increased as a result of this "subsidization" of DACC's operations by FODACC and its outside affiliates, and there was correspondingly a significant increase in DACC's "live releases" in an attempt to obtain the 90% live-release rate necessary to be deemed a "no-kill shelter"—which in turn produced a higher rate of stray dogs, a higher rate of dog-attack fatalities, a dog-bite rate that had more than doubled since Kumpf's start at DACC in September 2019,[2] and a "dysfunctional at best and otherwise non-existent" response

---

[1] The Goodmans are not parties to this appeal.

[2] Plaintiff alleged that Kumpf, who took over as director of DACC's operations several months after he was "fired as the Chief County Dog Warden" at the Animal Resource Center (ARC) in

to requests for investigation and enforcement by attack victims. Moreover, by allowing " 'reckless dog owners' " like the Goodmans to keep their dogs "in continued violation of [the] City Code," DACC was able "to collect revenue through fines and citations issued to" those individuals, thereby "furthering the pecuniary interest of" DACC while "not addressing the ongoing and continuous potential threat to public safety."

Regarding the individual-employee defendants, plaintiff alleged that they were grossly negligent because they engaged in "conduct . . . so reckless as to demonstrate a substantial lack of concern for whether an injury result[ed]," and that this conduct was "the direct and proximate" cause of Phillips's fatal injuries. Specifically, plaintiff alleged that the employees were fully aware that the Goodmans' dogs were "potentially dangerous, dangerous, and/or vicious" for years prior to their attack of Phillips because, since 2021, the dogs had been investigated repeatedly after one or more of them had bitten at least three other people, one of whom was a five-year-old boy. Indeed, plaintiff alleged that Summerfield had deemed at least one of these dogs to be "dangerous" following a bite-related investigation in 2021, but it was nonetheless returned to the Goodmans. And despite additional bites and complaints about the dogs' dangerous nature, the employees continually and recklessly disregarded their duties to properly enforce the relevant animal-control laws and ordinances as to them, instead allowing the Goodmans "to keep, harbor, and maintain the vicious animals" in violation of those laws and ordinances but in furtherance of DACC's pursuit of pecuniary profit through FODACC and its outside affiliates.[3] This reckless conduct resulted in

_____

Montgomery County, Ohio, had "unilaterally and recklessly instituted policies and procedures of DACC suiting his own personal beliefs and increasing revenues . . . just as he had done in his previous roles." Plaintiff quoted Kumpf's statements to an animal-control magazine in 2009 discussing how his shift away from strict enforcement of animal-control laws and ordinances had helped him get "revenue[] up" at the animal control departments he directed. Plaintiff also alleged that Kumpf's decades-long history in animal control "has been marred by multiple deaths, countless bites and attacks, and various other extra-judicial missteps," noting that ARC had seen "five human death caused by dog attacks" while under Kumpf's direction. Plaintiff alleged that Kumpf was also sued in 2015 in connection with the fatal dog attack of Klonda Richey—a woman who repeatedly notified ARC about the dangerousness of "two dogs housed next door" and, after "no action was taken by Kumpf or his officers," was fatally attacked by those two dogs. Citing to the court opinion regarding that lawsuit, plaintiff further alleged that, during that lawsuit, "evidence under Kumpf's control was destroyed."

[3] Specifically, plaintiff alleged that on January 29, 2021, at least two of the Goodmans' five dogs attacked both Roy Goodman and the five-year-old boy he was babysitting at the time, and although "the dogs were impounded" during Summerfield's investigation of the attack, they were eventually returned to the Goodmans despite Summerfield's recognition that at least one of the dogs should "be deemed dangerous." Additionally, on August 16, 2021, Roy Goodman pleaded guilty "to a misdemeanor citation" issued under an animal-control ordinance stating that " '[a]n animal owner, harborer, keeper or person who has custody of any animal shall prevent the animal from engaging in nuisance, menacing, potentially dangerous, or dangerous behavior.' " And, on four separate occasions between July 9, 2021, and December 1, 2022, "Trevina Goodman failed to appear for hearings regarding a misdemeanor citation" issued under an animal-control provision prohibiting

-3-

"an ongoing and continuous potential threat to public safety" and "all but assur[ed] that [a] violent and potentially deadly attack" of the sort Phillips suffered "was not a question of 'if' but 'when[.]' "

In lieu of filing an answer, and prior to any discovery taking place, defendants moved for summary disposition under MCR 2.116(C)(7), arguing that the City and DACC, as governmental agencies, and the individual governmental employees were entitled to immunity under the governmental tort liability act (GTLA), MCL 691.1401 *et seq*. Regarding the City and DACC, defendants argued plaintiff failed to plead in avoidance of governmental immunity and had not demonstrated that any of the statutory exceptions under the GTLA applied to this case, positing that activities related to animal care and control are a nonproprietary governmental function. Defendants also maintained that DACC, as a division of the City's health department, was not a separate legal entity that could itself be sued for damages. Regarding the individual employees, defendants argued that plaintiff had not sufficiently alleged that the employees' conduct was "the proximate cause" of Phillips's fatal injuries and therefore could not "maintain all elements of the requisite 'gross negligence' exception" to governmental immunity under MCL 691.1407(2). In support of their motion, defendants attached a copy of the complaint and copies of unpublished authority they discussed in their motion.

Plaintiff responded, arguing that she pleaded in avoidance of governmental immunity with regard to the City and DACC by specifically referencing the proprietary-function exception, MCL 691.1413, and by alleging facts that sufficiently demonstrated the applicability of that exception. Plaintiff further argued that, without discovery related to the "funding sources" within the City for DACC and to DACC's "enmeshed relationship" with FODACC, "it would be impossible for the court" to determine whether the proprietary-function exception applied in this case. Plaintiff also argued that she pleaded in avoidance of immunity with regard to the individual-employee defendants by alleging a gross-negligence claim against those employees and by pleading "facts sufficient to demonstrate [their] gross negligence," noting that she detailed "the various failures of th[ose] defendants with respect to the dogs owned by [t]he Goodmans," which "demonstrate[d] a wanton and reckless disregard as to whether harm would result despite the foreseeability of yet another attack by the subject dogs on a human." Plaintiff maintained that, under governing caselaw, these allegations were sufficient to demonstrate that defendants' gross negligence was "the proximate cause" of the fatal injuries at issue and that the allegations, at minimum, warranted discovery. In support of her arguments, plaintiff relied on the allegations of the complaint and stressed that defendants had not submitted with their motion any evidence to contradict those allegations. Plaintiff also attached to her response several pieces of documentary evidence, including reports that she obtained (albeit in redacted and incomplete form) through a Freedom of

---

her from "own[ing], harbor[ing], keep[ing], or shelter[ing] more than two animals of the same species over the age of four months in a single residence" and requiring her to properly license and register her dogs, which eventually resulted in a warrant for her arrest. Despite all of this, plaintiff alleged, the Goodmans were allowed to continue to house their five dogs and, on December 3, 2022, a man named Darryl Burke "was similarly attacked by the [Goodmans'] dogs." DACC investigators thereafter attempted to contact both Burke and the Goodmans but quickly "closed the 'investigation' after leaving a card on the door at [t]he Goodmans' home."

-4-

Information Act (FOIA) request regarding DACC's prior investigations into the dangerousness of Goodman's dogs, and an affidavit presenting text messages from defendant Summerfield in which she discussed the dangerousness of the Goodmans' dogs and her role in DACC's prior investigations.

Defendants replied, primarily reiterating their initial arguments. Defendants also asserted that DACC did "not come remotely close to the proprietary function exception" because enforcement of animal control was a nonproprietary governmental function and because DACC "operates as a <u>significant</u> cost expenditure loss, not as a revenue generator." As support, defendants provided an affidavit from Lowle stating that DACC "is funded by tax dollars" and "[t]he revenue collected by [DACC] has never exceeded costs"; Lowle's affidavit, in turn, pointed to an attached excerpt from the City's publicly available Fiscal Year 2025-2028 Four-Year Financial Plan, which showed DACC's adopted expenditures and revenues for the 2024 and 2025 fiscal years and its forecasted expenditures and revenues for the 2026-2028 fiscal years. As to the individual employees, defendants reiterated their position that the Goodmans, and not the individual employees, were *the* proximate cause of Phillips' fatal injuries, and argued that plaintiff's cited authority did not prove otherwise. Defendants asserted that Summerfield's text messages provided by plaintiff were "out of context," "a distraction," and "beside the point," but did not elaborate further. As with their initial motion, defendants did not offer any documentary evidence regarding plaintiff's gross-negligence claims.

A hearing was held to address defendant's motion in June 2024. The parties' arguments at the motion hearing largely mirrored their written arguments. Defendants argued that the City and DACC were entitled to governmental immunity because animal control was a nonproprietary governmental function and because the Sowle affidavit and accompanying financial plan clearly demonstrated that DACC was not a profitable business, and plaintiff had not shown otherwise. Defendants also argued that the individual employees were entitled to governmental immunity because plaintiff had not alleged sufficient facts to demonstrate that the employees' conduct was the proximate cause of Phillips's fatal injuries; instead, plaintiff had only alleged facts demonstrating that the Goodmans were the proximate cause because they had failed to properly secure their dogs. Plaintiff countered that, because defendants did not provide any affidavits, depositions, or documentary evidence to contradict the pleadings, the court was required to accept the pleadings as true, and the pleadings properly alleged both the proprietary-function and the gross-negligence exceptions to governmental immunity. Plaintiff also emphasized that defendants' motion asked the court "to determine as a matter of law that there's no possible factual development that could justify recovery" and argued that the complaint "demonstrate[d] clear factual disputes" that warranted discovery against defendants, so summary disposition at that point "would be premature" and "truly harsh."

The trial court denied defendants' motion for summary disposition as "premature." The court found that, when considering the complaint as required by MCR 2.116(C)(7), plaintiff had "plead[ed] in avoidance of governmental immunity with respect to . . . both gross negligence and a proprietary function," and it would be "too soon to grant the motion" before any discovery on those issues had been conducted. This appeal followed.

## II. STANDARDS OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition, as well as questions of statutory interpretation involving the application of governmental immunity under the GTLA. *Jones v Bitner*, 300 Mich App 65, 71-72; 832 NW2d 426 (2013). "MCR 2.116(C)(7) tests whether a claim is barred because of immunity granted by law[.]" *Burise v City of Pontiac*, 282 Mich App 646, 650; 766 NW2d 311 (2009) (quotation marks and citation omitted). "A plaintiff can overcome such a motion . . . by alleging facts that support the application of an exception to governmental immunity." *Id*. When considering a motion under MCR 2.116(C)(7), a reviewing court "must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them." *Dextrom v Wexford Co*, 287 Mich App 406, 428; 789 NW2d 211 (2010). "If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact." *Id*. at 429. "If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts," the court must decide as a matter of law whether the claim is barred, but "if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate." *Id*. "Generally, a motion for summary disposition is premature if granted before discovery on a disputed issue is complete," but "summary disposition may nevertheless be appropriate if further discovery does not stand a reasonable chance of uncovering factual support for the opposing party's position." *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 24-25; 672 NW2d 351 (2003).

## III. THE CITY AND DACC

On appeal, the City and DACC argue that the trial court should have granted summary disposition in their favor because plaintiff failed to plead any applicable exception to governmental immunity—specifically, the proprietary-function exception. We disagree. Plaintiff sufficiently pleaded the proprietary-function exception in the complaint, and the trial court did not err in deeming summary disposition premature as to this exception.

The GTLA, MCL 691.1401 *et seq.*, generally immunizes governmental agencies engaged in a governmental function from tort liability, unless an enumerated statutory exception applies. *McLean v Dearborn*, 302 Mich App 68, 73; 836 NW2d 916 (2013). The scope of governmental immunity is construed broadly, and the exceptions to it are interpreted narrowly. *Milot v Dep't of Transp*, 318 Mich App 272, 276; 897 NW2d 248 (2016). One such exception is the proprietary-function exception, MCL 691.1413, which provides, in relevant part:

> The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees.

"Therefore, to be a proprietary function, an activity: (1) must be conducted primarily for the purpose of producing a pecuniary profit; and (2) it cannot be normally supported by taxes and

fees." *Herman v Detroit*, 261 Mich App 141, 145; 680 NW2d 71 (2004) (quotation marks and citation omitted).

Regarding the first prong, there are two relevant considerations: (1) "whether a profit is actually generated" and (2) "where the profit generated by the activity is deposited and how it is spent." *Dextrom*, 287 Mich App at 421 (quotation marks and citation omitted). The proprietary-function exception ultimately "turns on the agency's motive," so the exception "does not *require* that the activity actually generate a profit," but whether it consistently does so may be evidence of an intent to make a profit. *Id*. at 421-422 (quotation marks and citation omitted); see also *Herman*, 261 Mich App at 145. Thus, although actual generation of a profit is relevant, it alone is not dispositive. *Herman*, 261 Mich App at 145; *Dextrom*, 287 Mich App at 421-422. The same holds true as to whether the activity "[c]onsistently operat[es] at a loss." *Dextrom*, 287 Mich App at 422; see also *Coleman v Kootsillas*, 456 Mich 615, 621; 575 NW2d 527 (1998) ("The fact that a governmental agency pursues an activity despite consistent losses may be evidence that the primary purpose is not to make a pecuniary profit, but it is not conclusive evidence.") (citation omitted). Similarly, where the generated profit is deposited and how it is spent are alone not dispositive, but are indicative of the agency's intent. *Herman*, 261 Mich App at 145; *Dextrom*, 287 Mich App at 422. For instance, "[i]f profit is deposited in the general fund or used on unrelated events, the use indicates a pecuniary motive, but use to defray expenses of the activity indicates a nonpecuniary purpose." *Herman*, 261 Mich App at 145.

Regarding the second prong, "[t]o be excluded from the proprietary function exception to immunity, an activity need not actually be supported by taxes or fees if it is a kind normally supported by taxes or fees." *Id*. at 145. That said, "immunity for an activity that is a governmental function can still be forfeited if conducted for profit in such a scope as to render it a private profit-making enterprise." *Id*. at 146. To determine "whether an activity is 'normally supported by taxes or fees,' " the reviewing court must consider the type of activity and its scope "in relation to the size of the community, its profitability, and how other communities of similar size support" the activity, "rather than merely the funding history of the activity in question." *Dextrom*, 287 Mich App at 425-426, citing *Coleman*, 456 Mich at 623.

In this case, plaintiff, in her complaint, specifically identified the proprietary-function exception, MCL 691.1413, and affirmatively alleged that the City and DACC were engaged in a proprietary function at the time of the dog attack in question. Plaintiff also alleged facts to demonstrate that the exception applied in this case. As set forth above, plaintiff alleged at length that, in recent years, DACC had entered into a financially motivated arrangement with FODACC and its outside affiliates under which DACC would receive access to those affiliates' "ample resources" by adopting their "goals and ideals"—thereby allowing these nongovernmental entities "to exert extensive influence into how and when [the animal-control section] of the City Code is, or is not, enforced," and "ced[ing] its control in exchange for the pecuniary profit that affiliation with FODACC" and its affiliates "provides to the DACC." This arrangement, plaintiff alleged, prioritized pecuniary benefit over public safety, and resulted in both increased revenues from 2019-2023, as well as a higher rate of stray dogs, a higher rate of dog-attack fatalities, and a dog-bite rate that had more than doubled. And relatedly, plaintiff alleged that DACC furthered its "pecuniary interest" by allowing " 'reckless dog owners,' " such as the Goodmans, to keep their dogs "in continued violation of [the] City Code" so that DACC could "collect revenue through fines and citations issued to" those owners—rather than taking appropriate and requisite

enforcement action with respect to those dogs and their owners to "address[] the ongoing and continuous potential threat to public safety" that they posed.

When taken as true and construed in a light most favorable to plaintiff, these allegations set forth sufficient facts to justify the application the proprietary-function exception to governmental immunity. See *Dextrom*, 287 Mich App at 421, 428-429. Plaintiff, in essence, alleged that DACC conducted its animal-control functions "primarily for the purpose of producing a pecuniary profit," prioritizing the agenda and interests of private donors to increase its revenues at the expense of public health and safety. *Herman*, 261 Mich App at 145 (quotation marks and citation omitted); see also *Dextrom*, 287 Mich App at 421-422. This method of operating, plaintiff alleged, was a marked departure from DACC's prior norm and from how it was supposed to function as a local animal-control agency under applicable laws and ordinances, and effectively "render[ed DACC] a private profit-making enterprise." *Herman*, 261 Mich App at 146; see also *Dextrom*, 287 Mich App at 425-426.

In their motion for summary disposition, defendants did not meaningfully engage with the complaint's invocation of the proprietary-function exception or its specific allegations to that effect. Instead, defendants broadly argued that "the activity of enforcing an animal control ordinance is a nonproprietary governmental function" and that plaintiff had merely alleged conduct that was "in the regular course of animal care and control activities." As detailed above, however, this characterization is belied by the specific allegations of the complaint, which pleaded that defendants were recklessly disregarding what they should have been doing in the regular course of their duties in order to prioritize profit. And the mere fact that animal care and control, writ large, may be a governmental function does not mean that the proprietary-function exception cannot apply to how that function is—or is not—being performed in this case. See, e.g., *Coleman*, 456 Mich at 620 (explaining that "the fact that garbage collection and disposal is a governmental function does not mean that a city cannot be held liable . . . if the activity is proprietary in nature").[4]

---

[4] In advancing this argument below and on appeal, defendants have primarily relied on *Christopher v Baynton*, 141 Mich App 309, 311; 367 NW2d 378 (1985). In *Christopher*, 141 Mich App at 311, we held that the trial court "properly granted summary judgment in favor of the City of Taylor" because "[w]e feel that protection of the public from vicious, dangerous or diseased animals is a nonproprietary governmental function." *Christopher*, however, involved an underlying cause of action that arose before July 1, 1986, and so the current, effective version of proprietary-function exception of the GTLA, MCL 691.1413, did not apply. See 1986 PA 175, amending MCL 691.1401 *et seq.* (stating that MCL 691.1413 "shall not apply to causes of action which arise before July 1, 1986"). Furthermore, the question at issue in *Christopher*, 141 Mich App at 311, was whether, under the relevant legal standards then in place, "the city's activities in enforcing its animal control ordinance are governmental functions"—namely, whether "the activities of the pound master in enforcing the animal control ordinances are not of the essence of governing." We do not find in *Christopher*'s resolution and brief analysis of that point anything to foreclose plaintiff, as a matter of law, from invoking the current proprietary-function exception based on her specific allegations in this case.

Accordingly, defendants' motion failed to show that plaintiff had not pleaded in avoidance of governmental immunity on the basis of the proprietary-function exception.

It was not until their reply brief in support of their motion that defendants attempted to address plaintiff's specific allegations regarding proprietary function or to offer any evidence in response to them. Defendants—pointing to an affidavit from Sowle and its attached excerpt from the City's Fiscal Year 2025-2028 Four-Year Financial Plan—argued that plaintiff's allegations were "laughable" because "[t]here is no pecuniary profit" and DACC "does not make any money," but instead "operates at a significant cost expenditure loss."

We agree with the trial court's conclusion that this evidence is insufficient to entitle defendants to summary disposition at this time. As discussed, whether DACC actually generates a profit or instead operates at a loss may well be relevant to whether the proprietary-function exception applies, but it is not alone dispositive. See *Coleman*, 456 Mich at 621; *Herman*, 261 Mich App at 145; *Dextrom*, 287 Mich App at 421-422. Furthermore, plaintiff's allegations regarding DACC's funding and increased revenues focus on the years 2019 through 2023—a period that precedes defendants' offered financial information. Similarly, defendants' offered evidence does not, on its face, address FODACC or the nature or scope of DACC's funding relationship with it and its outside affiliates, which is the very heart of plaintiff's allegations. And finally, plaintiff has not yet had a meaningful opportunity to respond to or test defendants' offered evidence, let alone build a factual record in support of her position—both because defendants opted to move for summary disposition before any discovery had taken place, and because defendants then opted to only offer this evidence with their reply brief rather than their initial motion.[5] Given the detailed allegations in support of plaintiff's position, as well as the undeveloped record now before us, we cannot say that defendant is entitled to judgment as a matter of law or that "further discovery does not stand a reasonable chance of uncovering factual support for [plaintiff's] position." *Peterson Novelties*, 259 Mich App at 25; see also *Dextrom*, 287 Mich App at 428-429 (explaining that, in reviewing a motion under MCR 2.116(C)(7), a court "must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them," and "if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate").[6]

---

[5] It bears noting that there is no apparent reason why defendants could not have offered this evidence and related argument when they initially filed their motion for summary disposition. As discussed, plaintiff's allegations plainly put the subject matter at issue, and there is nothing about the evidence to suggest that defendants could not have offered it sooner. Instead, defendants opted to focus their motion solely on the legal adequacy of the allegations themselves.

[6] See also, e.g., *Alexander v City of Detroit*, unpublished per curiam opinion of the Court of Appeals, issued February 17, 2022 (Docket No. 356962), p 6 (affirming the trial court's denial of the City's and DACC's pre-discovery motion for summary disposition because "the facts [we]re largely undeveloped regarding whether DACC's nonprofit partner in operating the foster program [at issue] charges for adoptions, or how that nonprofit's fostering activities are supported by donations, grants, or otherwise, and whether DACC receives any pecuniary benefit from the

In sum, while defendants' offered evidence may bear on plaintiff's claim that the proprietary-function exception applies in this case, defendants have failed to show that they are, at this juncture, entitled to judgment as a matter of law on its basis. For the reasons discussed, plaintiff's allegations were sufficient to plead in avoidance of governmental immunity, and we see no error in the trial court's conclusion that it would be premature to grant defendants' motion as to the City and DACC under MCR 2.116(C)(7) before any discovery is completed.[7]

## IV. INDIVIDUAL EMPLOYEES

Like the City and DACC, the individual-employee defendants also argue that the trial court should have granted summary disposition in their favor because plaintiff failed to plead in avoidance of governmental immunity—namely, that plaintiff failed to sufficiently plead the gross-negligence exception to governmental immunity. And as with the City and DACC, we disagree. Plaintiff sufficiently pleaded the gross-negligence exception in the complaint, and the trial court did not err in deeming summary disposition premature as to this exception.

The GTLA extends governmental immunity to an individual governmental employee for injuries caused during the course of employment if he or she: (a) was "acting or reasonably believe[d] he or she [wa]s acting within the scope of his or her authority"; (b) the governmental agency for which he or she works "is engaged in the exercise or discharge of a governmental function"; and (c) his or her conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." MCL 691.1407(2). Although a plaintiff must sufficiently plead gross negligence in the complaint, "the burden . . . fall[s] on the governmental employee to raise and provide his entitlement to immunity as an affirmative defense." *Odom v Wayne Co*, 482 Mich 459, 479; 760 NW2d 217 (2008).

Conduct is grossly negligent for purposes of the GTLA when it is "so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a).

---

partnership," and the plaintiff was "not in position to challenge the[] statements [in DACC's offered affidavit] until she obtain[ed] discovery"). Unpublished opinions are not binding on this Court, but they may be considered persuasive. *People v Roy*, 346 Mich App 244, 251 n 2; 12 NW2d 183 (2023).

[7] Defendants also argue on appeal, as they did below, that DACC should be dismissed because, unlike the City, it cannot itself be sued given that it is a division of the City's health department. At the root of defendants' argument is *McPherson v Fitzpatrick*, 63 Mich App 461, 464; 234 NW2d 566 (1975), which stated that the Detroit Police Department would not be "liable in a tort action directed solely against" it because it, as "[a] municipal department, board or commission, . . . is unable to raise funds for payment[.]" It bears noting that, as reflected in *McPherson*, the GTLA's definition of "political subdivision" at the time of that decision did not include, as it does now, "an agency, department, court, board, or council of a political subdivision." Compare *McPherson*, 63 Mich App at 463 (quoting MCL 691.1401(b), as enacted by 1964 PA 170), with MCL 691.1401(e). In any event, given *McPherson*'s focus on the ability to raise funds and given plaintiff's specific allegations regarding DACC's funding in this case, we decline to decide at this juncture whether dismissal of DACC from this suit is warranted.

"Grossly negligent conduct must be conduct that is substantially more than negligent" and that instead amounts to "a willful disregard of safety measures and a singular disregard for substantial risks." *Bellinger v Kram*, 319 Mich App 653, 659-660; 904 NW2d 870 (2017) (quotation marks and citations omitted); see also *id*. at 660 (explaining that, "[g]enerally, allegations or evidence of inaction or claims that a defendant could have taken additional precautions" are insufficient to establish gross negligence).

As detailed above, plaintiff alleged that the individual-employee defendants were grossly negligent because they knew, due to numerous incidents and investigations since 2021, that the Goodmans' dogs were "potentially dangerous, dangerous, and/or vicious" and posed an "ongoing and continuous threat to public safety"—but defendants nonetheless opted not to properly enforce the relevant laws and ordinances against the dogs or the Goodmans in order to "further[] the pecuniary interest of" DACC. This, plaintiff alleged, amounted to "conduct . . . so reckless as to demonstrate a substantial lack of concern for whether an injury result[ed]," and "all but assur[ed] that [a] violent and potentially deadly attack" of the sort at issue here "was not a question of 'if' but 'when[.]' "

We agree with plaintiff that these allegations demonstrate "a willful disregard of safety measures and a singular disregard for substantial risks," *Bellinger*, 319 Mich App at 660 (quotation marks and citation omitted), and are sufficient to plead grossly negligent conduct under MCL 691.1407(8)(a). In their motion for summary disposition, defendants did not offer evidence or argument to the contrary.[8] Instead, defendants focused on arguing that plaintiff had not sufficiently pleaded that they were "the proximate cause" of Phillips's fatal injuries, as required by MCL 691.1407(2).

As with a traditional claim of gross negligence, a defendant's alleged gross negligence under the GTLA must be both a factual and proximate cause of the plaintiff's injuries. *Ray v Swager*, 501 Mich 52, 64-65; 903 NW2d 366 (2017) (*Ray I*). For purposes of the GTLA, however, the defendant's gross negligence must be "*the* proximate cause," MCL 691.1407(2) (emphasis added), which "means the one most immediate, efficient, and direct cause preceding an injury," *Robinson v Detroit*, 462 Mich 439, 446; 613 NW2d 307 (2000). A proximate-cause determination under the GTLA "does not entail the weighing of factual causes but instead assesses the legal responsibility of the actors involved." *Ray I*, 501 Mich at 71-72. Thus, a court must "take all possible proximate causes into account" when determining whether the governmental employee's

---

[8] Although defendants argue on appeal that plaintiff failed to establish a question of fact regarding whether the employees' conduct rose to a gross-negligence standard, they never raised such an argument below, and therefore did not afford the trial court an opportunity to address it. We decline to do so in the first instance here. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227-228; 964 NW2d 809 (2020) (noting that a party may "make a more sophisticated or fully developed argument on appeal than was made in the trial court" but is generally prohibited from "raising an issue for the first time on appeal"); *Tolas Oil & Gas Exploration Co v Bach Srvs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023) (explaining that, under the "raise or waive" rule of appellate review for civil cases, "[i]f a litigant does not raise an issue in the trial court, this Court has no obligation to consider [it]").

gross negligence was *the* proximate cause of the plaintiff's injuries, and whether there is a question of fact to that effect. *Id*. at 63, 76, 83. "This requires considering [the] defendant's actions alongside any other potential proximate causes to determine whether [the] defendant's actions were, or could have been, the one most immediate, efficient, and direct cause of the injuries." *Ray v Swager (On Remand)*, 321 Mich App 755, 760; 909 NW2d 917 (2017) (*Ray II*) (quotation marks and citation omitted).

As this Court has recognized, the mere fact that a governmental employee's grossly negligent conduct was more remote in time from the injury than another individual's negligent conduct does not eliminate the possibility that the governmental employee's conduct was *the* proximate cause of the plaintiff's injury under the GTLA. *Id*. at 760-762, citing *Ray I*, 510 Mich at 64-65, 71-72, 76, 83. "The relevant inquiry is not whether the defendant's conduct was the immediate factual cause of injury, but whether, weighing the legal responsibilities of the actors involved, the government actor could be considered the proximate cause." *Ray II*, 321 Mich App at 760 (quotation marks and citation omitted). Additionally, "because proximate cause is concerned with the foreseeability of consequences, only a human actor's breach of a duty can be a proximate cause." *Ray I*, 501 Mich at 72. Consequently, although "nonhuman and natural forces" can "bear on the question of foreseeability," they "cannot be considered 'the proximate cause' of a plaintiff's injuries for the purposes of the GTLA." *Id*.

Here, plaintiff properly alleged that the employees were both a factual cause and the proximate cause of the fatal dog attack on Phillips. See *Ray I*, 501 Mich at 64-65; *Odom*, 482 Mich at 479; *Dextrom*, 287 Mich App at 428-429. Plaintiff alleged that the employees' grossly negligent conduct was a factual cause of the fatal dog attack because the attack could not have occurred had the employees properly enforced the relevant animal control provisions of the City Code. Plaintiff also alleged that the employees' grossly negligent conduct was "the direct and proximate" cause of Phillips's fatal injuries because, given the employees' dangerous-dog determination and repeated investigations into the dangerousness of the Goodman's dogs due to subsequent biting incidents, it was foreseeable—indeed, "not a question of 'if' but 'when' "—that another dangerous biting incident with the Goodmans' dogs would occur.

In both their motion for summary disposition and their reply, defendants did not attempt to offer any evidence to contradict plaintiff's allegations (or the supportive evidence she offered in her response). Rather, defendants simply contended that "the" proximate cause was the dog attack itself and, after that, the Goodmans as the dog owners, emphasizing that the employees' alleged conduct was too remote from the attack to be considered the proximate cause under the GTLA. But, as "nonhuman . . . forces," the dogs themselves could not be the proximate cause. *Ray I*, 501 Mich at 72. The Goodmans, meanwhile, certainly could be a proximate cause, and perhaps even *the* proximate cause; after all, and as defendants stress, plaintiff did allege in her complaint that the Goodmans were negligent in managing the dogs. But that possibility, in itself, does not mean that defendants are entitled to judgment as a matter of law at this stage of the proceedings. We do not yet know what discovery will show regarding the Goodmans' conduct—what exactly they each did or failed to do with respect to their dogs, whether and to what extent it amounted to negligence (or worse), and whether it was a factual and legal cause of the attack on Phillips. And although defendants' alleged gross negligence was more remote in time from the fatal attack than the alleged negligence of the Goodmans, it is nonetheless still legally possible for one or more of defendants to be deemed "the proximate cause" under the GTLA—including if either or both of

the Goodmans are also found to be a proximate cause. See *Ray I*, 501 Mich at 76, 83; *Ray II*, 321 Mich App at 760-762. Taking plaintiff's allegations as true and absent any discovery regarding the Goodmans' or defendants' conduct, we cannot say as a matter of law that plaintiff cannot demonstrate that defendants were the proximate cause of plaintiff's injuries. See *Ray II*, 321 Mich App at 760-762; *Dextrom*, 287 Mich App at 428-429; see also *Peterson Novelties*, 259 Mich App at 24-25. Accordingly, the trial court did not err by concluding that summary disposition under MCR 2.116(C)(7) as to the gross-negligence exception to governmental immunity was premature before any discovery is completed.

Affirmed.

/s/ Michael J. Riordan
/s/ Kristina Robinson Garrett
/s/ Philip P. Mariani